753 A.2d 587

**Tyrone Joseph JONES**

**v.**

**STATE of Maryland.**

**No. 1962, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 9, 2000.

658

Michael R. Braudes, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General and Patricia Jessamy, State's Attorney for Baltimore City, on the brief), Baltimore, for appellee.

Argued before MOYLAN, JOHN J. GARRITY (Ret., Specially Assigned), ROBERT F. FISCHER (Ret., Specially Assigned), JJ.

MOYLAN, Judge.

The appellant, Tyrone Joseph Jones, was initially charged with 1) murder, 2) the use of a handgun in the commission of a

crime of violence, and 3) conspiracy to murder. A Baltimore City jury, presided over by Judge John N. Prevas, acquitted him of murder and the use of a handgun but convicted him of conspiracy to murder. On this appeal, he raises the five contentions

1) that the evidence was not legally sufficient to sustain the conviction for conspiracy to murder;

2) that Judge Prevas erroneously denied his motion to suppress his statement to the police;

3) that Judge Prevas erroneously refused to "dismiss" the case because of two alleged discovery violations by the State;

4) that Judge Prevas erroneously admitted both expert and lay opinion evidence; and

5) that Judge Prevas erroneously admitted hearsay evidence identifying the appellant as a perpetrator of the crime.

### Inferring an Agreement to Act in Concert
### From the Concerted Nature of the Action Itself

The appellant's first contention is that the evidence was not legally sufficient to support the conspiracy conviction. In conspiracy trials, there is frequently no direct testimony, from either a co-conspirator or other witness, as to an express oral contract or an express agreement to carry out a crime. It is a commonplace that we may infer the existence of a conspiracy from circumstantial evidence. If two or more persons act in what appears to be a concerted way to perpetrate a crime, we may, but need not, infer a prior agreement by them to act in such a way. From the concerted nature of the action itself, we may reasonably infer that such a concert of action was jointly intended. Coordinated action is seldom a random occurrence.

A thin line may sometimes separate 1) joint participation as a second-degree principal aiding and abetting the

first-degree principal in the perpetration of a crime and 2) an antecedent agreement to cooperate in that fashion. Theoretically, one might decide on the spur of the moment to aid and abet another in a crime without ever having been solicited to do so and without any even implicit understanding between the parties. In such a case, there would be joint participation but no antecedent conspiracy. More frequently, however, joint participation by two or more codefendants and a conspiracy, to wit, a mutual understanding, jointly to participate overlap. The former gives rise at least to a permitted inference of the latter. In this case, it is the evidentiary fact of the appellant's joint participation with another in a murder that is the predicate for the permitted inference of an antecedent agreement between the two so to coordinate their efforts.

The victim, sixteen-year-old Tyree Wright, was shot and killed at approximately 10:30 P.M. on June 24, 1998, as he sat on the outdoor steps of his family's home at 1701 East Federal Street in Baltimore. Three separate witnesses, all family members, described how two men emerged from an adjacent alley together and how one of the two produced a silver-plated revolver and fired several shots.

The circumstances of the approach and of the shooting were such that it was a reasonable inference that the two men were acting in concert. A key witness was Emanuel "Man" Johnson, the fourteen-year-old brother of Tyree Wright. Emanuel Johnson described how he was sitting on the steps with his family members when the two strangers suddenly emerged from an alley. His attention was drawn to them because of "the way they came up." As Emanuel saw the light of the gunfire, he saw the second man standing near the shooter. Based upon the clothing the second man was wearing, Emanuel later, both in court and in an on-the-street show-up, identified the appellant as that second man. Emanuel described how the two men, immediately after the shooting, turned and ran together "back down the alley."

Richard Uzzell, the victim's stepfather, testified as to the approach of the two strangers. He stated that they "had

come up through the alley, snuck up by the alley on Federal Street on the left-hand side of the alley."

David Michael Brown, the victim's uncle, was very specific in describing how the two men acted. He testified as to how "two guys come up the alley [who were] stooped down." He repeated how both men were "stooped down" as they emerged from the alley. He demonstrated for the jury the firing stance taken by the two. He described how they were "within arm's reach" of each other and "side by side, like on an angle like." He recalled how "[t]hey came out—and swung around like that."

After the police arrested the appellant a few minutes after the shooting, approximately six blocks away, swab samples were taken from his left hand. A police expert in forensic trace evidence analysis testified that tests established that the swabs revealed gunshot residue that would have been deposited on the appellant's hand "from either firing a gun or having your hand near a gun when it went off."

In denying the appellant's motion for a judgment of acquittal, Judge Prevas concluded:

> So every version that we've heard of the incident, the one coming from the Defense and the ones coming from the State were that *the two people in the alley were acting in concert, one was the shooter and the other one was the traditional aider and abetter in the sense of [his being] there to provide assistance.*

(Emphasis supplied).

Ironically, with respect to the existence of a conspiratorial agreement between the appellant and the gunman to shoot someone on the night of June 24, 1998, the defense significantly buttressed the State's case in that regard. It was the defense that managed to get before the jury, indirectly, observations of the crime scene and of antecedent circumstances made by one Michael West. It did so by cross-examining Detective Gary Hoover at length about statements made to him by Michael West.

The defense made this strenuous effort to get Michael West's statements before the jury because it believed they were exculpatory. In one sense, they were. West's description of the assailants who emerged from the alley differed from the descriptions given by the victim's family members. West's statements, therefore, tended to disprove the identity of the appellant as one of the assailants. Notwithstanding this arguably exculpatory evidence in that particular regard, the State nonetheless established a legally sufficient, *prima facie* case as to the criminal agency of the appellant through 1) the extrajudicial identification of him by Emmanuel "Man" Johnson, 2) the in-court identification of him by David Brown, and 3) the evidence of gunshot residue on his left hand.

Although Michael West's statements may have been exculpatory with respect to the appellant's criminal agency, they were, by diametric contrast, very definitely inculpatory in terms of the *corpus delicti* of a conspiracy. Those statements helped to show that the assailants who emerged from the alley, whoever they may have been, were acting in furtherance of a conspiratorial purpose. Michael West gave the assailants a common motive and a common purpose.

West's statements to Detective Hoover, recounted to the jury by Detective Hoover, included the fact that West was a neighborhood resident who observed the shooting from a distance of approximately one hundred feet. West was, moreover, a member of the guns-and-drugs segment of the neighborhood. As of June 24, West was involved with others in a gang war. West believed that on June 24 the "guys he was warring with went to the wrong corner and shot the wrong kid." During his cross-examination by defense counsel, Detective Hoover acknowledged West's description of the extended "war" between two rival gangs who had been "shooting at each other on a number of occasions":

Q: He told you that he'd been having a war, he'd been having a war over an extended period of time, and I use that in the vernacular, with a bunch of—basically his boys and another gang had basically been having a war?

A: Yes, sir, he said he'd been having trouble.

Q: And they'd been shooting at each other on a number of occasions, right?

A: Yes, sir.

West believed that the assailants, whoever they may have been, were actually gunning for him. Detective Hoover recounted a phone call from West to the murder victim's brother.

> In fact, he called Tyree's brother up in jail and said, I'm sorry man, I think they were gunning for me, that's why your brother got killed.

West's statements, substantively in evidence at the urging of the defense and without any hearsay objection, at least inferentially established that on the night of June 24 the gunman and his accomplice or accomplices were acting with a clear purpose to shoot and kill someone, probably West himself.[1] That is a *prima facie* case of a conspiracy to murder on the part of those assailants. It is other evidence from other sources, of course, that establishes the appellant's identity as one of those assailants.

We hold that the evidence was legally sufficient to permit the jury reasonably to find that the appellant and the shooter were acting in concert with the conspiratorial purpose of killing their intended victim. The evidence, therefore, was sufficient to support the verdict and Judge Prevas was not in error submitting the charge to the jury.

---

1. In fairness to defense counsel, the defense tactics with respect to Michael West made eminently good sense at the time. The charge of first-degree murder was still on the table and the lesser conspiracy charge was only peripheral. The primary defense, moreover, was that the appellant was not one of the assailants. It is simply an ironic twist of fate that the Michael West statements, arguably helpful to the defense on the central issue at trial, would later come back to haunt him on an unforeseen side issue. The appellant's heroic effort to exculpate himself may have saved the State's case.

## The Difference Between a Fourth Amendment "Seizure of the Person" and "Custody" Within the Contemplation of *Miranda v. Arizona*

■ The appellant's second contention is that Judge Prevas erroneously failed to suppress several brief responses made by the appellant to Officer Kevin DeVito during the short interlude between Officer DeVito's initial *"Terry* stop" of the appellant and the subsequent arrest of the appellant a few minutes later, after one of the witnesses to the crime was brought to the scene and made a "show-up" identification.

Based on the description of clothing worn by the second assailant, the appellant had been stopped on the street by Officer DeVito a few minutes after the shooting occurred and approximately six blocks away. Officer DeVito's testimony as to what he asked the appellant and as to the appellant's responses seems totally innocuous:

A: I asked him if he lived in the area, the specific area where we had encountered him, he indicated he did not. We asked him what he was doing or what he had been doing. He stated that he had been playing basketball with some friends and that he'd been dropped off on the corner.

I think, when I asked him where he lived, he gave me an address that was on the west side of town. I know that cause I used to work in the west side of town.

. . .

Q: When Mr. Jones told you he'd been dropped off in the area to play basketball, do you know what—did he give you an idea with time? This was between 10:30 and 11 o'clock when this is all happening, right? Did he tell you what time he'd been dropped off?

A: No, if it had come up, I don't recall.

It is hard to conceive of how anything in that quoted exchange could possibly have prejudiced the appellant. Because the appellant argues that he was confronted on cross-examination with the improbability of his further statement to

Officer DeVito that he was present in the neighborhood to purchase food at a carry-out, however, we will consider the contention further. The appellant now claims that when he gave those responses he was in custody for *Miranda* purposes but had not been "Mirandized" before being questioned by Officer DeVito. We hold, to the contrary, that the appellant was not in custody within the contemplation of *Miranda* and that there was, therefore, no need for him to have been given *Miranda* warnings.

■ The appellant, to be sure, had been seized within the contemplation of the Fourth Amendment and was not free to leave the scene. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). That was enough to engage the gears of the Fourth Amendment, but it was not enough to engage the gears of *Miranda v. Arizona.* As *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), made clear, every lawful detention within the contemplation of the Fourth Amendment is not *ipso facto* necessarily "custody" within the contemplation of *Miranda.*

In *Berkemer v. McCarty,* the defendant had been lawfully stopped on the highway for a traffic violation and, while sitting in his vehicle, was interrogated by the stopping officer. He gave several incriminating admissions without having been given *Miranda* warnings. The Supreme Court made it clear, 468 U.S. at 436–37, 104 S.Ct. 3138, that the defendant had been subjected to lawful detention, to wit, to the restraint of his person, within the contemplation of the Fourth Amendment:

It must be acknowledged at the outset that a traffic stop significantly curtails the "freedom of action" of the driver and the passengers, if any, of the detained vehicle. Under the law of most States, it is a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission. Certainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so. Partly for these reasons, we have long ac-

knowledged that *"stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth] Amendment,* even though the purpose of the stop is limited and the resulting detention quite brief."
(Citation and footnote omitted; emphasis supplied). Such restraint, however, said nothing about "custody" for *Miranda* purposes.

The defendant in *Berkemer* strenuously maintained that he was, in the very words of *Miranda,* "a person [who had] been taken into custody or otherwise deprived of his freedom of action in [a] significant way." 468 U.S. at 435, 104 S.Ct. 3138. The Supreme Court declined to get hung up by a phrase taken out of context and, instead, looked to the underlying circumstances that had necessitated the very birth of the *Miranda* catechism:

> However, we decline to accord talismanic power to the phrase in the *Miranda* opinion emphasized by respondent. *Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.* Thus, we must decide whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.

468 U.S. at 437, 104 S.Ct. 3138 (emphasis supplied).

*Miranda's* concern was with an interrogation environment so oppressive as to give rise to a presumption of compulsion in the context of the Fifth Amendment privilege against "compelled" self-incrimination. The concern was with the Kafka-esque trappings of the "third degree." The drum-like refrain of the *Miranda* analysis repeated and re-echoed the theme of "incommunicado interrogation" in a "police-dominated atmosphere."

Early on, this Court recognized that *Miranda* could not have been written in a constitutional vacuum and that *Miranda's* only claim to constitutional legitimacy was necessarily bottomed on its holding that "custodial interrogation," as dealt

with and described in that opinion, was so "compelling" and "coercive" presumptively to violate the Fifth Amendment privilege. Without the presumption of compulsion, the Supreme court lacked any jurisdictional basis for imposing the *Miranda* catechism on the states. In *Cummings v. State,* 27 Md.App. 361, 364–66, 341 A.2d 294 (1975), we referred to that indispensable predicate of "custodial interrogation" as spelled out by *Miranda:*

> A scanning of *Miranda[ v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] makes its thrust preeminently clear.... "[T]he defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world." Ibid., at 384 U.S. 445[, 86 S.Ct. 1602]. *Miranda* pointed out that all of the four cases being dealt with in that umbrella opinion "share salient features—*incommunicado interrogation of individuals in a police-dominated atmosphere* ..." Ibid., at 445[, 86 S.Ct. 1602]. It pointed out that the major danger of the "in-custody interrogation" is that *its incommunicado character* obscures a later judicial determination of what really transpired. "An understanding of the nature and setting of this in-custody interrogation is essential to our decisions today ..." Ibid., at 445[, 86 S.Ct. 1602]....

> ...

> *Miranda* made it very clear that the warnings it mandated and the waiver it required were "employed to dispel the compulsion inherent in custodial surroundings." Ibid., at 458[, 86 S.Ct. 1602]. *The evil at which the prophylactic devices of Miranda were aimed was made very clear. "An individual swept. from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak ..." Ibid.*

(Emphasis supplied). We focused, 27 Md.App. at 366–67, 341 A.2d 294, on the required linkage between circumstances amounting to "inherent compulsion" and the prophylactic device designed to counteract such compulsion:

The constitutional distillate of *Miranda* is that self-incrimination flowing from a custodial interrogation is, *ipso facto, compelled* self-incrimination because of *the inherent coercion—the inherent compulsion—of the custodial interrogation environment.* In the custodial interrogation situation, therefore, the constitutionally damning element of compulsion can only be extirpated by the elaborate prophylactic process of warning and waiver prescribed by *Miranda* as the required compulsion antidote. *Absent the compulsion, there is no need for the antidote.*

(First emphasis in original; emphasis supplied).

Indeed, that was the very analysis later employed by the Supreme Court in *Berkemer* to distinguish a curbside detention, notwithstanding that it was a Fourth Amendment seizure of the person and that the suspect was not free to leave, from "custodial interrogation" under circumstances presumptively constituting unconstitutional compulsion. The mere "stop," unless it escalates into a more significant detention, will presumably be brief, whereas custodial interrogation may frequently be prolonged indefinitely, with the suspect fearing that "questioning will continue until he provides his interrogators the answers they seek."

Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced "to speak where he would not otherwise do so freely." First, *detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes.* A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, *questioning incident to an ordinary traffic stop is quite different from station-house interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will*

*continue until he provides his interrogators the answers
they seek.*

468 U.S. at 437–38, 104 S.Ct. 3138 (emphasis supplied). The
*Berkemer* Court went on to point out that a mere "stop,"
albeit attended by some inevitable psychic pressure and anxi-
ety, is neither "incommunicado" nor "in a police-dominated
atmosphere."

Second, circumstances associated with the typical traffic
stop are not such that the motorist feels completely at the
mercy of the police. To be sure, *the aura of authority
surrounding an armed, uniformed officer* and the knowl-
edge that the officer has some discretion in deciding wheth-
er to issue a citation, in combination, *exert some pressure on
the detainee to respond to questions. But other aspects of
the situation substantially offset these forces.* Perhaps
most importantly, *the typical traffic stop is public,* at least
to some degree. *Passersby, on foot or in other cars,
witness the interaction of officer and motorist. This expo-
sure to public view both reduces the ability of an unscrupu-
lous policeman to use illegitimate means to elicit self-
incriminating statements and diminishes the motorist's
fear that, if he does not cooperate, he will be subjected to
abuse.* The fact that the detained motorist typically is
confronted by only one or at most two policemen further
mutes his sense of vulnerability. In short, *the atmosphere
surrounding an ordinary traffic stop is substantially less
"police dominated" than that surrounding the kinds of
interrogation at issue in Miranda* itself and in the subse-
quent cases in which we have applied *Miranda.*

468 U.S. at 438–39, 104 S.Ct. 3138 (footnote omitted; emphasis
supplied).

With what turns out to be dispositive significance for the
contention now before us, the Supreme Court in *Berkemer,*
468 U.S. at 439–40, 104 S.Ct. 3138, then analogized a traffic
stop to a more crime-oriented *"Terry* stop" and went on to
point out that neither involves the type of "custodial interroga-
tion" required to bring into play "the dictates of *Miranda.*"

In both of these respects, *the usual traffic stop is more analogous to a so-called "Terry stop" than to a formal arrest.* ... [A] policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." Typically, this means that *the officer may ask the detainee a moderate number of questions* to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.... *The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda.*

(Citations and footnotes omitted; emphasis supplied).

The holding of the Supreme Court with respect to both traffic stops and *Terry* stops was clear. Equating a traffic stop with a *Terry* stop, the Supreme Court concluded:

The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that *persons temporarily detained pursuant to such stops are not "in custody" for the purposes of Miranda.*

468 U.S. at 440, 104 S.Ct. 3138 (emphasis supplied).

In *Reynolds v. State,* 88 Md.App. 197, 210, 594 A.2d 609 (1991), this Court recognized and applied *Berkemer*'s distinction between a traffic stop or *Terry* stop, on the one hand, and "custodial interrogation," on the other hand:

The *Berkemer* opinion reminded us that *the custodial setting dealt with by Miranda*—a setting severe enough to give rise to a presumption of compulsion—*was one wherein a suspect was held "incommunicado" and "in a police dominated atmosphere."* It then went on to point out that *even a legally authorized detention or seizure of the person in the context of a traffic stop or even a Terry stop did not amount to custody within the contemplation of Miranda.* Critical distinguishing factors were 1) that even the legally compelled stop would only last a little while and then the

detainee would be free to go upon his way and 2) that the stop was frequently in public or in the presence of friends and relatives and was by no means the "incommunicado" situation calling for the strong antidote of *Miranda*.

(Emphasis supplied).

█ Based on articulable suspicion, Officer DeVito subjected the appellant to a *Terry* stop and brief detention while a potential eyewitness was brought to the scene. That stop was on a public street. We hold that such brief and quasi-public questioning of the appellant by Officer DeVito was not "custodial interrogation" within the contemplation of *Miranda v. Arizona*. Absent *Miranda*'s applicability, there can be no *Miranda* violation. *Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).

### Discovery Violations vs. *Brady* Violations

The appellant's third contention is that his conviction should be reversed because the State failed to make timely discovery to him of information given by one Michael West to Detective Gary Hoover in the course of Detective Hoover's investigation of the crime. To evaluate the timeliness of discovery, we note that the trial took place from July 12 through July 19, 1999. Did the appellant know what he needed to know in time to use it?

The name and address of Michael West, as a potential State's witness, was given by the State to the defense on April 26, 1999, the very day that Detective Hoover and the prosecutor first learned about his existence and possible significance. The appellant, however, relies not upon Rule 4–263(b)(1), which requires the State merely to disclose the names and addresses of all persons it intends to call as witnesses, but upon subsection (a)(1), which provides:

(a) **Disclosure without request.** Without the necessity of a request, the State's Attorney shall furnish to the defendant:

(1) Any material or information tending to negate or mitigate the guilt or punishment of the defendant as to the offense charged.

The appellant argues that what Detective Hoover learned from Michael West was exculpatory within the contemplation of that subsection and that the substance of what Michael West had to say should have been furnished to the defense as soon as possible.

Before we turn to the question of when the defense learned the substance of Michael West's possible testimony, we note that that testimony seemed as if it would have been, at best, ambiguous. West was a member of a gang in the neighborhood that was involved in dealing drugs. His gang, moreover, was actually involved in a gang war as of the night the shooting took place. West claimed to have observed the shooting from approximately 100 feet away. He believed that the attack may actually have been aimed at himself. At various times, he gave Detective Hoover conflicting accounts of his ability to identify the men in the alley. He, to be sure, never identified the appellant.

Of present pertinence, however, is that, whatever significance the account of Michael West may have had, Michael West actually testified at a pretrial hearing on July 9, 1999, three days before the trial even began and a full week before the State rested its case. He testified under oath and was subject to open-ended examination by the appellant. At the conclusion of his testimony on July 9, defense counsel asked that West "be available." Judge Prevas granted that request. He first directed that Michael West remain in court on the front bench, so that, as soon as the pretrial hearing was over, defense counsel could confer with him before he was taken back to a prison facility for the night. Judge Prevas ruled, moreover, that Michael West would be brought back to the courthouse on the same writ on every trial day through the following week.

When a pretrial hearing continued on July 12, the prosecutor stated for the record that both she and defense counsel

had spoken with West on July 9. Defense counsel acknowledged that West had said that the assailants "are still out there" but that he "does not want to reveal who they are." Judge Prevas reconfirmed that West would continue to be brought to the courthouse on a daily basis so as to be fully available to defense counsel. Judge Prevas explained:

> [Defense counsel], as newly-developing events occur [during the 3–1/2 to 4 days scheduled for presentation of the State case in chief] can go down to lockup and meet with [West] time and time again, as he sharpens his focus on how he is going to present his defense. So he will be there each day, and you can call him as a Defense witness.

When Detective Hoover took the stand four days later, on July 16, defense counsel questioned him about statements given to him by Michael West. The State never called Michael West to the stand. Neither, significantly, did the defense.

In confronting this contention, it is important to identify the precise legal basis for the appellant's complaint and then not to stray too far from that base. In recent years, there has been a noted tendency on the part of many trial attorneys to conflate alleged discovery violations and alleged *Brady* violations into a hopelessly confused amalgam. The colloquy between defense counsel and the trial judge in this case at times wandered back and forth between Rule 4–263(a)(1) and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The appellant's brief intersperses its discussion of the Maryland Rule with repeated references to *Brady*. As we carefully noted in *DeLuca v. State*, 78 Md.App. 395, 424, 553 A.2d 730 (1989), however, the two phenomena are quite distinct:

> *Brady* and its progeny deal not, as here, with discovery sufficiently timely to enable the defense team to calibrate more finely its trial tactics but with the very different issue of withholding from the knowledge of the jury, right through the close of the trial, exculpatory evidence which, had the jury known of it, might well have produced a different verdict. Suppression contemplates the ultimate

concealment of evidence from the jury, not the tactical surprise of opposing counsel. The *Brady* sin is hiding something and keeping it hidden, not hiding something temporarily in order to surprise someone with a sudden revelation. Even if the latter were just as sinful, it would be a different sin with a different name.

*See also Stewart v. State,* 104 Md.App. 273, 286–88, 655 A.2d 1345 (1995). Let us first identify the precise sin alleged.

As we discuss the appellant's third contention, let it be absolutely clear that we are dealing only with Md. Rule 4–263 and not with the Due Process Clause of the Fourteenth Amendment. This case does not involve any alleged *Brady* violation, to wit, the suppression by the State of exculpatory evidence throughout the entire course of a trial. In this case, the defense knew everything about Michael West that the State knew and it knew it before the trial even started.

What the defense claim ultimately reduces itself to is an argument that the disclosure of evidence that might have been of assistance to the defense was not *timely*. The appellant makes no reference in the body of his brief to any timeliness requirement, but presumably he is referring to Rule 4–263(e), which provides in pertinent part:

(e) **Time for discovery**. The State's Attorney shall make disclosure pursuant to section (a) of this Rule within 25 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4–213.

Even if that is the subsection the appellant would like to invoke, we are still adrift. The appellant provides no guidance as to whether that subsection was, indeed, violated, for he does not tell us when the first appearance of counsel occurred or when the first appearance of the appellant before the court occurred. From what do we measure? Without that information, there is no way for us to apply Rule 4–263(e). How do we know whether something is late unless we know when it was due? We could, of course, dig this information out of the record for ourselves, but we are not going to do for the

appellant, nor are we obliged to do for the appellant, what he is perfectly capable of doing for himself.

Without suggesting for a moment that the possible testimony of Michael West was exculpatory within the contemplation of Rule 4–263(a), we will, *arguendo,* assume that it was. The State, on the very day it learned about Michael West, informed defense counsel that he was a potential witness. The case was initially scheduled for trial several days later, on April 29, 1999. It was postponed because the Assistant State's Attorney who was slated to prosecute it was tied up in another court.

It is disingenuous for defense counsel now to claim a total lack of awareness as to the possible significance of Michael West, for counsel acknowledged before Judge Prevas that an agreement had been reached with the State, whereby Michael West would be transported to the courthouse from the Eastern Correctional Institute on April 29 so that both the State and the defense would "have an opportunity to talk to him." When the trial was postponed, that plan aborted, but the appellant suggests no reason why his counsel could not have nonetheless interviewed Michael West on his own. It is also disingenuous for the appellant now to excuse his non-diligence in that regard by referring to West as "a member of the criminal underworld who would not be easy to track down." The written confirmation from the Assistant State's Attorney to defense counsel of her earlier advisement pinpointed precisely where Michael West was located and would remain located:

> Confirm our conversation on 4/26/99 following is an additional witness, Michael West, 859 Harlem Avenue, Baltimore, Maryland. This witness is currently in the Department of Corrections at the Eastern Correctional Institute. His date of birth is 5/26/78 and his ID number is 52678 and it's signed Stephanie L. Royster, Assistant State's Attorney, Baltimore City.

He would have been very "easy to track down."

In any event, whatever defense counsel failed to learn, though it was available to be learned, between April 26 and

July 9 was ultimately learned on July 9 when defense counsel fully debriefed Michael West. The defense decision not to call Michael West to the stand a week later was purely a tactical one. What the defense hoped to get before the jury, of course, was that Michael West gave descriptions of the men who came up the alley on the night of June 4, 1998 that differed from the descriptions given by the family of the murder victim. Indirectly and with the benefit of a mild relaxation of the Rule Against Hearsay, the defense got precisely that information before the jury through its cross-examination of Detective Hoover.

Even if we were also to assume, again only *arguendo*, that it was the State's obligation to synopsize the possible testimony of Michael West for the defense and that it was the State's further obligation to get that information into the hands of the defense before July 9, the appellant fails utterly to make any persuasive argument as to how he was critically prejudiced by such failure. As Judge Hollander pointed out for this Court in *Rosenberg v. State*, 129 Md.App. 221, 259, 741 A.2d 533 (1999):

> Assuming, *arguendo*, that the State violated the discovery rules, Maryland Rule 4–263(i) gives a trial court the discretion to fashion remedies for a discovery violation. *The purpose of the discovery rules is to "assist the defendant in preparing his defense, and to protect him from surprise."*

(Emphasis supplied).

■ The appellant never requested a continuance on the ground that he needed more time to prepare a defense. He never requested some lesser sanction. He simply moved for "a dismissal," presumably either a mistrial or a judgment of acquittal. The law is clear, however, that even given a discovery violation, the choice of an appropriate sanction is entrusted to the discretion of the trial judge. *Evans v. State*, 304 Md. 487, 499 A.2d 1261 (1985); *Aiken v. State*, 101 Md.App. 557, 647 A.2d 1229 (1994).

In *Ross v. State,* 78 Md.App. 275, 286, 552 A.2d 1345 (1989), we discussed this subject of appropriate sanctions versus windfalls:

Assuming that they should have been discovered pretrial, the appellant yearns for a sanction which is excessive. The discovery law is not an obstacle course that will yield a defendant the windfall of exclusion every time the State fails to negotiate one of the hurdles. Its salutary purpose is to prevent a defendant from being surprised. Its intention is to give a defendant the necessary time to prepare a full and adequate defense.

Although the purpose of discovery is to prevent a defendant from being surprised and to give a defendant sufficient time to prepare a defense, defense counsel frequently forego requesting the limited remedy that would serve those purposes because those purposes are not really what the defense hopes to achieve. The defense, opportunistically, would rather exploit the State's error and gamble for a greater windfall. As Chief Judge Gilbert explained for this Court in *Moore v. State,* 84 Md.App. 165, 176, 578 A.2d 304 (1990), however, the "double or nothing" gamble almost always yields "nothing":

Once counsel learned Mr. Murphy would testify, they could have but did not move prior to trial for a continuance; or they could have but did not seek, prior to Murphy's testifying, a continuance in order to ascertain what that testimony would be. Appellants apparently endeavored to exclude the testimony rather than pursue other forms of relief. They, we believe, took a calculated risk, i.e., they waited until the witness was called and then objected. In the vernacular, they went "for all or nothing at all." Their miscalculation will not result in a new trial.

■ The appellant posits as a second arguable discovery violation the State's marshaling of its evidence with respect to the gunshot residue found on the appellant's left hand. One week before the trial commenced, the State informed the defense that a gunshot residue expert, Daniel Van Gelder, would testify. On July 15, just before Mr. Van Gelder was

called to the stand, defense counsel objected to having been furnished Mr. Van Gelder's name a week earlier and argued that "it should have been provided to me a year ago."

The original test had, indeed, been performed approximately a year earlier by a different analyst. As the trial date approached and when the State realized that that analyst would be on vacation at the time of trial, it arranged for a new test to be conducted by Mr. Van Gelder. It immediately informed the defense of that new development.

Whatever the appellant's complaint is, it is something other than a discovery violation: "The State could easily have ascertained long before trial that a new expert and new report would be required because of the vacation plans of the original examiner." We know of no rule mandating when the State shall check on the vacation plan of its potential witnesses. However that complaint is categorized, Judge Prevas did not abuse his discretion in failing to exclude Mr. Van Gelder's testimony.

### Opinion Testimony, Expert and Lay

The appellant contends that in two instances Judge Prevas abused his discretion in ruling, over objection, that certain testimony was admissible. In the first instance, Daniel Van Gelder had been accepted as an expert witness on the subject of forensic trace evidence analysis. The appellant objected to the following ruling during the redirect examination of Mr. Van Gelder:

Q: [Prosecutor]: Now, when you fire a weapon, when a weapon is fired, generally speaking, how many particles, how many particles would you get on your hand? How many gunshot residue particles?

[Defense Counsel]: Your Honor, I object. This is not—

The Court: I'm going to sustain in part and overrule in part the objection and rephrase the question. Can you form an opinion to a reasonable degree of scientific certainty how many particles would be deposited by a gun as it was fired?

The Witness: There has been some research on this but very little and it's not very exact. Shall I give an answer?

The Court: A general range.

The Witness: A generally between—

[Defense Counsel]: Objection, Your Honor.

The Court: Overruled.

The Witness: Generally between 500 and 2500 particles.

The Court: That's based on what, sir, what range?

The Witness: What research has been done on that kind of a test.

Such rulings are entrusted to the wide discretion of the trial judge. We see no abuse of discretion here.

■ The second subcontention concerns a ruling by Judge Prevas on the admissibility of a lay opinion by Officer Kevin DeVito. Following the direct examination of Officer DeVito, Judge Prevas himself asked certain questions of the witness:

The Court: Aside from that, did you observe anything about his demeanor or his physical appearance, not meaning clothing, but anything else about him?

The Witness: Not until we actually spoke with him.

The Court: When you got close to him, what, if anything, did you observe?

The Witness: We observed the defendant—I would—

[Defense Counsel]: Objection as to we.

The Witness: Okay, I observed the defendant appeared, what I would characterize as nervous. He was looking about. He was looking out at the other persons that had walked away from the crowd—or had walked away from the corner, rather.

By [the Prosecutor]:

Q: Now, when you saw the defendant, where on Eager and McDonogh did you first locate him?

[Defense Counsel]: I object to the answer. He doesn't know my client to make observations, to make a decision

about whether he was nervous or not when he was approached by two police officers.

The Court: I would prefer to have the arguments at the bench.

[Defense Counsel]: I—sorry.

The Court: The objection is overruled. You may answer based on anything that you know. Don't speculate about anything that you don't know.

Such rulings are entrusted to the wide discretion of the trial judge. We see no abuse of discretion here. *Bruce v. State,* 328 Md. 594, 630, 616 A.2d 392 (1992); *Galusca v. Dodd,* 189 Md. 666, 669–70, 57 A.2d 313 (1948).

Both of these contentions, moreover, are trivial in the extreme. Even if we thought there were error (we do not), we would not hesitate to deem it harmless.

## A Non–Contention

The appellant's final contention is disputatious just for the sake of being disputatious. Fortunately, it evaporates with the evaporation of its factual predicate.

When the appellant was stopped by Officer DeVito a few minutes after the shooting and approximately six blocks away, he was detained there so that Emanuel "Man" Johnson, the victim's brother, could be brought there to see if he could make an identification. Johnson arrived and made that identification. Both Johnson and Officer DeVito testified as to that on-the-street identification. For whatever reason, a recording of a radio conversation among police officers with respect to the "show-up" procedures was introduced into evidence. In the course of it, some officer referred to a positive identification of the appellant having been made. In any event, *Jones v. State,* 310 Md. 569, 588–89, 530 A.2d 743 (1987), is dispositive; no error occurred.

The appellant made it clear, moreover, that he had no objection to a reference to a positive identification if it had been uttered by Officer DeVito, but he did object to any such reference by an unidentified officer. The objection was not to

the fact of the extrajudicial identification itself but to who was competent to comment on or make references to that extrajudicial identification. With respect to the recording, Officer DeVito testified as to the voice in question, "I think that was mine. I'm pretty sure that was mine." The appellant hangs his hat on Officer DeVito's acknowledgment that such tapes are difficult to understand. Judge Prevas ruled that the recording was admissible and we see no abuse of discretion in that ruling. Even if it were error, however, we would not hesitate to deem it harmless.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.*