791 A.2d 161

**William James BRYANT**

v.

**STATE of Maryland.**

**No. 814, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Feb. 6, 2002.

608

Michael Milne, Towson, for appellant.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both of Baltimore, and Frank Weathersbee, State's Atty. for Anne Arundel County, Annapolis, on the brief), for appellee.

Argued before DAVIS, SALMON, and RAYMOND G. THIEME, Jr. (Ret'd, Specially Assigned), JJ.

RAYMOND G. THIEME, Jr., Judge (Retired, Specially Assigned).

In this case we are called upon to address the singular issue of whether an individual may be convicted of driving under the influence of alcohol when the police officer who placed the charge neither observed the individual driving nor occupying any vehicle. Appellant William James Bryant was charged with driving while intoxicated, spinning his wheels, and failing to sign a traffic citation. Following a bench trial, the trial court acquitted Bryant of those charges, but convicted him of driving under the influence of alcohol. He was sentenced to one year of incarceration, with all but one weekend suspended. Additionally, he was ordered to complete one year of supervised probation with conditions that he continue alcohol counseling and participate in the Ignition Interlock Program. Bryant appeals his conviction and presents the following questions for our review:

1. Did the trial court err in admitting appellant's statement to police and the results of the field sobriety tests?

2. Was the evidence legally sufficient to sustain the conviction for driving under the influence of alcohol?

Perceiving no error by the trial court, we shall affirm its judgment.

### Facts

At 12:10 a.m. on the morning of November, 18, 2000, Officer R.E. Crawford of the Anne Arundel County Police Department arrived at 644 Spriteway in Glen Burnie in response to a call concerning an assault at that address.[1] He gathered information from two neighbors—Teressa Rice and Robert Daly—who were outside near that home at that time. Based on the information he received from these witnesses, Crawford

---

1. Appellant was also charged with second degree assault and reckless endangerment as a result of the events of that night. Those charges were addressed in a separate proceeding, however, and are not at issue in this appeal.

believed that Bryant may have operated an automobile while intoxicated an hour earlier.

Crawford then went over to question Bryant about what had occurred. When he did so, he observed that Bryant's "speech was slurred, eyes glazed and he had the odor of an alcoholic beverage on his breath." They were outside in the roadway area at this time. Bryant was not inside or near any automobile. Crawford asked Bryant whether he had consumed alcohol. Bryant answered that he had "[t]hree mixed drinks of Jim Bean [sic] prior to driving home."

Crawford then asked Bryant to perform several field sobriety tests. Bryant complied, but failed the tests. At trial, Crawford testified, "He failed as he couldn't stand on one leg without losing his balance and almost falling over. He was not able to stand on one leg for more than three, three numbers in sequence." Crawford then asked Bryant to recite the complete alphabet. Bryant recited the letters in order, but stopped at "v." Next, Crawford asked Bryant to perform a walk and turn test, in which Bryant was to take four steps heel to toe, pivot on the balls of his feet, and return. Crawford testified, "He failed as he couldn't walk four steps heel to toe, up and back. Each step wasn't heel to toe as required and the driver had to use his arms to balance himself from falling over. At one point he almost fell over." At that point, Crawford placed Bryant under arrest for driving while intoxicated.[2]

At trial, Teressa Rice testified that she lived nearby at 650 Spriteway and that she was outside her house smoking a cigarette at approximately 11:15 p.m. on the subject night. She recalled hearing squealing wheels and seeing an automobile pull up near her home at that time. She recognized Bryant as the driver of the vehicle, and her neighbor David O'Neal as the passenger. She testified that the vehicle "hit the curb, almost hit the mailbox." She stated that Bryant and

2. As we stated at the outset, Bryant was initially charged with driving while intoxicated, but was convicted of driving under the influence.

O'Neal "stumbled in the house, made a lot of noise getting inside. They could hardly walk." She later added that Bryant "stumbled all the way to the house and went inside."

Robert Daly testified that he also lived nearby, at 648 Spriteway, and that he was outside with Teressa Rice at 650 Spriteway at 11:15 on that night. He said that the automobile came "squealing around the corner ... and almost hit our mailbox in the front." He also identified Bryant as the driver of the automobile. Daly recalled that Bryant "walked a fast pace to the door of the house," and that he was not stumbling, but in fact "was walking actually pretty normally."

Leslie Crawford testified that she lived with Lloyd David O'Neal at 644 Spriteway. She said she was asleep in the townhouse until she "heard the commotion outside" at approximately 11:15 p.m. She said she "heard a car pull up" and "drunk babble that was loud." She then looked out through her window and saw Bryant and O'Neal in the yard walking toward the house. She testified that Bryant stayed in the townhouse for about twenty minutes and had no drinks during that time. She said that an altercation ensued between her and Bryant at approximately 11:45 p.m., at which time she ran out of the house to Teressa Rice's house. She stayed outside her home until the police arrived at 12:10 a.m.

Lloyd David O'Neal testified as a witness for the defense. He said, "We went back inside the house and the idea was to stay there so that Mr. Bryant would not drive home." He denied that Bryant hit the curb when they arrived at the townhouse. He estimated that he and Bryant had arrived at the townhouse at "approximately 10:00/10:30," which actually is inconsistent with all other witness accounts. He was asked whether Leslie Clifford was in the house when he and Bryant had arrived. He replied that he did not see Clifford in the house when they arrived, that "at some point" he did see her, but that he did not "know exactly what time." He testified that he actually never saw Clifford enter the house, but that he did "remember her being there, at a later time." He recalled that he and Bryant had been in the townhouse for

about an hour when police arrived. He testified that, to the best of his recollection, he remembered seeing that Bryant had two alcoholic drinks while they were inside.

He was asked by the State, "Isn't it true that you were highly intoxicated that evening?" He responded, "Yes, I was." Later in his testimony, he was asked how much alcohol he had consumed during the relevant portion of that evening. He responded, "I can't give you an estimate on that. It was a lot." When asked this question once again by the trial judge, he responded, "Your Honor, I really can't give you an exact amount. I know that it was a lot. And I did feel very intoxicated." When asked again about his memory as to the time they arrived at the townhouse, he said, "Your Honor, I gave an approximate 10:00 to 10:30. That is the best I could come up with. I didn't give the exact time—. Memory—. I couldn't remember." O'Neal admitted on cross-examination that he and Bryant were very good friends, and that he would not want to see anything bad happen to Bryant.

At the conclusion of trial, the trial judge rendered his verdict, stating:

> What I have is, you know we talked about a time line, but I do have a gentleman who there is a screeching of tires. They look up, they see a vehicle come around the corner. They see the vehicle jump the curb, go back down into the parking space, almost hit the mailbox. By all accounts they see the Defendant get out of the car. One witness indicates that he stumbles to the door. The other one indicates that he walks normally.
>
> In any event, he gets into the apartment. They hear noises and screaming and what have you. Ms. Clifford comes running out. Then I learn that Mr. Daly goes back in and sees Mr. O'Neal sitting, or holding the Defendant down for whatever reason. The police come.
>
> Yes, there is a time gap in there. And, for me, I guess to believe that there were two drinks, I would have to believe, hook, line and sinker, Mr. O'Neal's testimony. And quite candidly out of everyone that testified, I think he is the least

credible. And not because I think he is purposely lying to me, but because I think he was so drunk he really has no recollection of what went on that night. I mean for him to tell me he got in at 10:00 or 10:30, sat there. Mr. Bryant had a couple of drinks. It just—it stretches my believability of him and I just can't—I can't put any weight in his testimony. The policemen get there. They accost Mr. Bryant, his eyes are glassy, alcohol on his breath. One leg stand, we have been through it, the alphabet. We walk and turn. He can't do any of them.

Based on—it is a circumstantial case, but based on the fact that the Court is convinced that Mr. Bryant was drinking before he drove. He admitted to such to the police officer. Based on the fact that two witnesses put him behind the wheel. Based on the fact that when the police get there—. Well, what occurs from the time he goes into the house to the time the police get there, and then what the police see and hear, certainly leads the Court to believe that Mr. Bryant had too much to drink that night and that he certainly is—ability to drive was impaired by the consumption of alcohol.

The trial judge then concluded: "I do find him guilty of driving under the influence." Bryant was convicted pursuant to Md.Code (1977, 1999 Repl.Vol.), § 21–902 of the Transportation Article, which provided in pertinent part: [3]

(b) *Driving while under the influence of alcohol.*—A person may not drive or attempt to drive any vehicle while under the influence of alcohol.

### Discussion

### I.

■ Bryant contends that Officer Crawford had no legal basis to detain him. He concedes that Crawford "arguably

---

**3.** The applicable provision has been amended since Bryant's conviction, but that amendment is not applicable in this case because of the dates involved.

possessed reasonable articulable suspicion that an assault had been committed at the residence," but argues, "Officer Crawford's testimony was completely void of any facts that would constitute articulable suspicion, reasonable or otherwise, that the [a]ppellant had violated the drunk driving statute ... or that the [a]ppellant had even driven a motor vehicle on the night in question."

We find no merit to Bryant's contention. While it is true that Crawford did not personally witness Bryant driving an automobile, it is also true that he received abundant information from eyewitnesses who did observe Bryant driving and acting in a manner attributable to his intoxication. The two witnesses who had been outside—Rice and Daly—provided Crawford with sufficient information for him to form a reasonable articulable suspicion that Bryant had violated the drunk driving statute.

■■■ "The Fourth Amendment protects against unreasonable searches and seizures, including seizures that involve only a brief detention." *Ferris v. State*, 355 Md. 356, 369, 735 A.2d 491 (1999). The United States Constitution requires that the "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (footnote omitted). The reasonableness of any intrusion is measured against an objective standard: whether a reasonably prudent person in the officer's position would have been warranted in believing that the suspect was involved in criminal activity that was afoot. *Derricott v. State*, 327 Md. 582, 588, 611 A.2d 592 (1992). "Due weight must be given not to [an officer's] inchoate and unparticularized suspicion or 'hunch,' but to 'the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.'" *Id.* (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868). "A valid investigatory stop requires only that 'the police have specific articulable facts which, taken together with rational inferences from those facts, create reasonable suspicion that the person has been or

is about to be involved in criminal conduct.'" *Aiken v. State,* 101 Md.App. 557, 567, 647 A.2d 1229 (1994) (quoting *Aguilar v. State,* 88 Md.App. 276, 281, 594 A.2d 1167 (1991)). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989) (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868). The level of suspicion necessary to show reasonable suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." *Quince v. State,* 319 Md. 430, 433, 572 A.2d 1086 (1990) (citations omitted). "In reviewing the factors that led the agents to stop and question the respondent, it is important to recall that a trained law enforcement agent may be 'able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.'" *United States v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497, 515 (1980) (citations and internal quotation marks omitted).

■ Bryant finds it significant that the eyewitnesses themselves did not testify regarding precisely what information they provided Crawford when he arrived at the scene. Bryant is focusing his attention on minute technical reasoning in arriving at this assertion, however, and we decline his invitation to consider the evidence in a vacuum. During his cross-examination, Crawford testified that, "as to the driving part, it was ... the witness testimony that [he] received from the witnesses at the scene" that provided him with reasonable grounds to question Bryant.

> The courts, in deciding whether a reasonable articulable suspicion exists, do not focus on singular isolated facts but upon the totality of the circumstances. We cannot engage in piecemeal refutation of each individual factor as being consistent with innocence. It is the entire mosaic that counts, not single tiles.

*State v. Darden,* 93 Md.App. 373, 385, 612 A.2d 339 (1992) (citations and internal quotation marks omitted).

We are cognizant of the fact that, at the time he approached Bryant, Crawford was faced with the issue concerning the amount of time that had elapsed from Bryant's arrival at the townhouse until Crawford's arrival at the scene. It is well-settled, however, and supported by the cases we have cited above, that the threshold showing required under the "reasonable articulable suspicion" standard has been met by the State on this issue. Crawford testified that he spoke with Clifford at the scene, who was able to provide him with additional information concerning the time period between Bryant's arrival in the automobile and Crawford's arrival at the scene. During his cross-examination, Crawford testified:

> My understanding, and I was clear of this because I believe this to be a critical point, that it was a complete time line from the point that Daly and Rice saw Mr.—the Defendant drive up to the residence, get out of the driver's seat, go into the residence. And at that point, Clifford maintained the time line until the point that I arrived.
>
> * * *
>
> So, I was clear about this when I was interviewing the witnesses that they maintained a time line to verify that Mr. Bryant hadn't gone in the residence and consumed alcoholic beverage[s]. So I specifically interviewed these witnesses and they each could speak to a certain period of time that they maintained observation on Bryant. And based on that, that led to my investigation and subsequent charging.

Under the circumstances, the information Crawford received from the witnesses adequately formed a basis for his articulable suspicion that Bryant had violated the drunk driving statute. This belief by Crawford was supported further by his observations when he approached Bryant. We find that Crawford possessed a reasonable articulable suspicion to believe that Bryant had violated the drunk driving statute at the time he approached him.

■ In what seems to be an extension of this argument, Bryant argues that the trial court erred in admitting Crawford's testimony regarding the field sobriety tests. He rea-

sons that these tests were performed as a result of an unconstitutional stop. We are not persuaded. We have ruled that Crawford had reasonable articulable suspicion to stop Bryant. Regarding the admission of the field sobriety tests, we note that Bryant has not properly preserved this issue for appeal. The trial judge admitted the testimony concerning the sobriety tests, but did so only "provisionally," as the trial judge commented, "I can throw it out at some later point if in fact things are not tied up." Bryant never subsequently asked that this ruling be revisited, and thus the trial court never considered the issue again. The better practice would have been for Bryant to once again raise the issue before the trial judge before the conclusion of the trial. This he did not do. In *White v. State*, 23 Md.App. 151, 156, 326 A.2d 219 (1974), we found that the appellant had waived his right to a ruling on a motion. We said:

> If the question is not of such importance to appellant that he remembers to request an answer, the court cannot be charged with screening previously decided motions to discern an unanswered sentence obscured by a plethora of unrelated issues. Nor can we permit such distended motions to be set as a trap for an unwary judge.

*Id.*

■ Bryant next contends that the trial court erred in admitting his statement to Crawford concerning the three Jim Beam drinks he had consumed prior to driving. He points out that *Miranda* warnings were not provided to him, and therefore the admission of the statement marked a violation of his *Miranda* rights. We find that this contention also is not properly before us, as Bryant has not preserved this argument for appeal. Md. Rule 4–252 provides, in pertinent part:

> (a) Mandatory motions. In the circuit court, the following matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise:

> (1) A defect in the institution of the prosecution;

(2) A defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense;

(3) An unlawful search, seizure, interception of wire or oral communication, or pretrial identification;

(4) An unlawfully obtained admission, statement, or confession; and

(5) A request for joint or separate trial of defendants or offenses.

(b) Time for filing mandatory motions. A motion under section (a) of this Rule shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4–213(c), except when discovery discloses the basis for a motion, the motion may be filed within five days after the discovery is furnished.

(Emphasis added.)

Bryant filed no such motion regarding this statement, and only raised this issue at trial through an objection at the time the statement was introduced during testimony by Crawford.[4] This objection was untimely pursuant to the Rule, as stated above.

Even in the event that Bryant had properly moved to suppress this statement, we would find that the trial court did not err in admitting it. In *Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court stated:

To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are

---

**4.** We emphasize that, during trial, Bryant argued to suppress the roadside sobriety test and the Breathalyzer test, but he never argued for suppression of his statement to Crawford.

adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation....

*Id.*

 "[P]reliminary to any decision to exclude evidence because it was gathered from the criminal suspect who was not advised of his *Miranda* rights is a determination of whether that evidence constitutes a statement stemming from custodial interrogation." *McAvoy v. State,* 70 Md.App. 661, 666–67, 523 A.2d 618 (1987). According to *Miranda,* custodial interrogation has occurred if and when one is in police custody and is subjected to express questioning or its functional equivalent. *Miranda,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

In *Jones v. State,* 132 Md.App. 657, 668, 753 A.2d 587 (2000), we stated:

*Miranda* made it very clear that the warnings it mandated and the waiver it required were employed to dispel the compulsion inherent in custodial surroundings. The evil at which the prophylactic devices of *Miranda* were aimed was made very clear. An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak....

\* \* \*

 The constitutional distillate of *Miranda* is that self-incrimination flowing from a custodial interrogation is, *ipso facto,* compelled self-incrimination because of the inherent coercion—the inherent compulsion—of the custodial interrogation environment. In the custodial interrogation situation,

therefore, the constitutionally damning element of compulsion can only be extirpated by the elaborate prophylactic process of warning and waiver prescribed by *Miranda* as the required compulsion antidote. Absent the compulsion, there is no need for the antidote. *Jones,* 132 Md.App. at 668–69, 753 A.2d 587 (citation and internal quotation marks omitted).

In *Jones,* we compared a mere stop with "custodial interrogation." We conceded that a stop certainly is a Fourth Amendment seizure of the person, and a suspect is not free to leave in such a situation, but, we stated:

"[C]ustodial interrogation" occurs under circumstances presumptively constituting unconstitutional compulsion. A mere "stop," unless it escalates into a more significant detention, will presumably be brief, whereas custodial interrogation may frequently be prolonged indefinitely, with the suspect fearing that "questioning will continue until he provides his interrogators the answers they seek."

*Id.* at 669, 753 A.2d 587.

In the instant case, Bryant was outside of his friend's home, presumably in a place with which he was fairly comfortable and familiar. He was questioned by only one police officer. The officer had recently arrived on the scene and was attempting to gather preliminary information as to what had occurred prior to his arrival. Bryant was not constrained physically at the time he was questioned. Other people were present during this time. It seems that some of these people probably were not particularly fond of William James Bryant, but they were nevertheless normal citizens, and presumably paying attention to what was taking place between Bryant and Crawford. Based on all of these circumstances, we cannot find that Bryant was subjected to the type of environment contemplated by *Miranda* and its progeny. We find that Bryant "was not in custody within the contemplation of *Miranda* and that there was, therefore, no need for him to have been given *Miranda* warnings." *Jones,* 132 Md.App. at 666, 753 A.2d 587.

## II.

 Appellant asserts that the evidence was insufficient to sustain his conviction for driving under the influence of alcohol. We disagree.

In reviewing the sufficiency of the evidence to sustain a criminal conviction, it is the duty of this Court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Taylor v. State,* 346 Md. 452, 457, 697 A.2d 462 (1997) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Moye v. State,* 139 Md.App. 538, 544, 776 A.2d 120 (2001).

 "The judgment of the circuit court will not be set aside unless clearly erroneous, with due regard given to the opportunity of the trial court to judge the credibility of the witnesses." *Taylor,* 346 Md. at 457, 697 A.2d 462.

When reviewing the sufficiency of the evidence, " 'it is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case.' " *McDonald,* 347 Md. at 474, 701 A.2d at 685 (citing *State v. Albrecht,* 336 Md. 475, 478, 649 A.2d 336, 337 (1994)). Our function is to review the evidence in the light most favorable to the State, see *id.* (quoting *Albrecht,* 336 Md. at 478, 649 A.2d at 337 (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979))), and to give " 'due regard to the [fact finder's] finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses.' " *Id.* (citing *Albrecht,* 336 Md. at 478, 649 A.2d at 337). While we do not re-weigh the evidence, we do determine whether the verdict was supported by sufficient evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of

the offenses charged beyond a reasonable doubt. *See id.* (citing *Albrecht,* 336 Md. at 478–79, 649 A.2d at 337). *White v. State,* 363 Md. 150, 162, 767 A.2d 855 (2001).

Some of the testimony by Clifford, particularly whether Bryant drank alcohol while inside O'Neal's townhouse, was contradicted by testimony from O'Neal. O'Neal said that Bryant consumed two drinks while they were in the townhouse, but the trial judge did not rely on this testimony. On the other hand, Clifford insisted that she watched Bryant for most of that time, and specifically remembers that Bryant had not even a drop of alcohol while she was there. To the extent that their testimony contradicted one another, the trial judge weighed more heavily the testimony by Clifford. Likewise, some of the details provided by Daly and Rice were contradictory, particularly as to the manner in which they observed Bryant walk as he exited the automobile to enter O'Neal's townhouse. Nonetheless, the trial judge was able to conclude that their accounts, taken together with the other evidence, indicated that Bryant was under the influence when he drove the automobile to O'Neal's townhouse.

Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the factfinder. See *Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037 (1991); *McKinney v. State,* 82 Md.App. 111, 117, 570 A.2d 360 (1990). In performing this role, the factfinder has the discretion to decide which evidence to credit and which to reject. *See Velez v. State,* 106 Md.App. 194, 202, 664 A.2d 387 (1995). Contradictions in testimony or determinations of credibility go to the weight of the evidence, and not to its sufficiency. *Binnie,* 321 Md. at 580, 583 A.2d 1037; *Smiley v. State,* 138 Md.App. 709, 719, 773 A.2d 606 (2001).

As we have pointed out, the trial judge found the testimony by O'Neal to be "the least credible" of all the witnesses. In keeping with what we have said thus far, certainly we are aware that it is not our task to assess credibility of witnesses, but we merely pause to note our agreement with the trial judge regarding his determinations of credibility in this case.

It was rather obvious from the testimony by O'Neal that his memory as to the events in question was of extremely limited use, as it is clear from the record that his level of intoxication during the night in question prevented him from being a helpful witness.

The defense attempted to convince the trial court that Clifford was not credible, and that she only arrived at the townhouse after Bryant and O'Neal. O'Neal stated that he never saw Clifford enter the house, and that he only saw her in the house at all at a time after he and Bryant had already been inside. On the other hand, Clifford testified that she was asleep in the house when Bryant and O'Neal arrived, and that their loud behavior woke her. It was not unreasonable for the trial court to conclude that O'Neal never saw her enter the house because, as Clifford testified, she was already in the house when he arrived. It is very likely that O'Neal did not recall exactly when he first saw her because he was so intoxicated.

After Clifford was involved in an altercation with Bryant, anywhere from ten to thirty minutes passed—the precise amount of time depending on whose version is most accurate—in which Clifford was not in the home, and therefore unable to observe whether Bryant consumed alcohol then. The only evidence, however, that Bryant did consume alcohol during that time was that provided through testimony by O'Neal. That testimony was discounted by the trial judge. It is clear why the trial court chose to disregard much of the testimony by O'Neal, particularly pertaining to the crucial issue of whether Bryant drank while in the townhouse. Essentially, without such testimony by O'Neal on that issue, the defense provided no evidence whatsoever on whether Bryant drank while in the townhouse. Accordingly, concluding that Bryant did in fact consume alcohol while in the townhouse would require a leap of faith not supported by the credible evidence presented at trial. Accepting Bryant's claim concerning his consumption of alcohol while in the townhouse would seem unreasonable in light of the amount of evidence

indicating that Bryant already was under the influence upon his arrival.

In any event, O'Neal testified that he and Bryant had come back to his townhouse "and the idea was to stay there so that Mr. Bryant would not drive home." Although the trial judge did not mention it when he rendered his verdict, it is common-sensical to conclude that this testimony by an individual called to the stand as a defense witness clearly must have been taken into consideration when he weighed the inconsistencies in the testimony by the various witnesses. This testimony by O'Neal clearly provided great support for the finding that Bryant in fact was under the influence by the time they arrived at O'Neal's townhouse. Also significant was Bryant's admission to Crawford that he had consumed three Jim Beam drinks prior to driving.

■ Crawford did not observe Bryant drive or operate the automobile. Rather, he came to the conclusion that Bryant had done so based on information he received from eyewitnesses. The results from the Breathalyzer test were not admitted because a certified copy was not presented at trial. The evidence against Bryant consisted of observations by witnesses. Convictions are handed down consistently based on similar circumstances. A "conviction may be had without a chemical analysis on any competent evidence legally sufficient to establish the *corpus delicti* of the crimes and the criminal agency of the accused." *State v. Werkheiser,* 299 Md. 529, 540, 474 A.2d 898 (1984) (quoting *Major v. State,* 31 Md.App. 590, 596, 358 A.2d 609 (1976)).

Not infrequently an automobile accident involves an individual intoxicated or under the influence. Often, the officers arriving at the scene sometime after the actual collision place that person under arrest without even seeing the individual inside an automobile. Such arrests are often based on information provided by witnesses, coupled with subsequent information the officers gather as part of their investigation. That is no different than what occurred here. The instant case was further complicated, however, because of an arguably signifi-

cant passage of time between the time of the violation and the time the officers arrived at the scene. This issue was dealt with at length at trial, however, and the trial judge assessed the credibility of the various accounts as to what occurred during that time, ultimately determining that the violation of the statute took place.

Giving due regard "to the opportunity of the trial court to judge the credibility of the witnesses," *Taylor*, 346 Md. at 457, 697 A.2d 462, and based on our review of the record, we find no reason to disturb the findings by the trial judge regarding the credibility, or lack thereof, of the testimony by the witnesses in this case. Bearing in mind the applicable standard on sufficiency determinations, we hold that the evidence adduced at Bryant's trial was indeed sufficient to support his conviction. We point out that the evidence adduced against Bryant at trial was sufficient to sustain his conviction even without the testimony by Officer Crawford. The testimony by the witnesses who observed his driving and his conduct after exiting the vehicle, along with his own admission, constituted sufficient evidence to sustain his conviction.

 Bryant's conviction rested on circumstantial evidence that he violated the drunk driving statute. "Although a conviction may rest on circumstantial evidence alone, a conviction may not be sustained on proof amounting only to strong suspicion or mere probability." *White*, 363 Md. at 162, 767 A.2d 855. "Circumstantial evidence which merely arouses suspicion or leaves room for conjecture is obviously insufficient. It must do more than raise the possibility or even the probability of guilt. It must ... afford the basis for an inference of guilt beyond a reasonable doubt." *Id.* at 163, 767 A.2d 855.

Circumstances existed from which a reasonable inference could be drawn that Bryant drove the automobile while he was under the influence of alcohol. The witness testimony at trial painted a picture that pellucidly contained enough information from which to draw this conclusion. The evidence against Bryant on which his conviction was based, viewed in a light

most favorable to the State, supports a rational inference that he violated the drunk driving statute. Therefore, the evidence supports his convictions. *Moye*, 139 Md.App. at 550, 776 A.2d 120. Restated in other words, we are convinced that the admissible evidence adduced at trial either supported a rational inference of, or demonstrated either directly or circumstantially, the facts to be proved, from which any fact-finder could fairly have been convinced, beyond a reasonable doubt, of Bryant's guilt for violating the drunk driving statute. We affirm his conviction. *Metz v. State*, 9 Md.App. 15, 23, 262 A.2d 331 (1970).

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**