764 A.2d 863

**Jose E. ARGUETA**

v.

**STATE of Maryland.**

**No. 831, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Jan. 3, 2001.

Stephen B. Mercer (Sandler & Mercer, P.C. on the brief), Rockville, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Douglas Gansler, State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Argued before HOLLANDER, THIEME* and KRAUSER, JJ.

THIEME, Judge.

The Circuit Court for Montgomery County convicted appellant Jose E. Argueta for carrying a concealed dangerous or deadly weapon. The court subsequently imposed an eleven-month sentence, which was suspended in favor of eleven months of supervised probation. Appellant appeals his conviction and raises the following issues for our review:

1. Whether the trial court erred in failing to suppress the Defendant's statement.
2. Whether there was sufficient evidence to support a conviction of the Defendant for violating Article 27, § 36.

We answer "yes" to question 1 and therefore reverse appellant's conviction; we find it unnecessary to consider question 2.

## Facts

Officer Edwardo Lagos of the Montgomery County Police Department spotted appellant, along with a group of four other people, on the sidewalk in the area of Sage and Cinnamon Drive in Montgomery County. Three of the subjects had their hands in their pockets; the officer interpreted this behavior as a gang sign. As he approached the group, the officer noticed a bulge in appellant's front waistband. He asked appellant whether he possessed any drugs or weapons. After appellant answered that he did not, Officer Lagos received consent from appellant to search his person. At that time, a second police officer arrived.

Officer Lagos stood behind appellant and ordered him to spread his legs and raise his hands over his head. The officer patted down appellant and pulled out a fourteen-inch knife

---

* Thieme, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

from appellant's waistband. Officer Lagos then called out the other officer's name in order to make him aware of the discovery, as the other officer was still with the other subjects at this time. Approximately thirty seconds after the discovery of the knife, the officer asked appellant what he was doing with the knife. Appellant replied that he was carrying the knife in order to scare another group of men that had been standing nearby. Appellant was then instructed to sit down while Officer Lagos tried to find out whether the other subjects possessed any weapons. Appellant had not been given his *Miranda* warnings before he gave his statement concerning why he had the knife. Appellant was handcuffed after his response to the officer's question; this was approximately one minute after the discovery of the knife.

Officer Lagos testified that appellant had been arrested for possession of the knife and conceded that appellant was not free to go as soon as he saw the knife. The officer further testified that, although appellant was not free to go after the knife was discovered, the question pertaining to why appellant had the knife was merely part of the officer's investigation, and appellant was not formally arrested until he was placed in handcuffs and ordered to sit down.

Appellant argues that he was subjected to custodial interrogation but not advised of his privilege against self-incrimination or his right to counsel before being asked why he had the knife. Therefore, appellant contends, the trial court erred in denying his motion to suppress his comment to Officer Lagos. We agree.

(a)

*Standard of Review*

In reviewing the denial of a motion to suppress, this Court looks to the facts adduced at the suppression hearing that are most favorable to the State as the prevailing party. *In Re: Patrick Y,* 124 Md.App. 604, 608–09, 723 A.2d 523 (1999). "In determining whether the denial of a motion to suppress . . . is correct, the appellate court looks to the record

of the suppression hearing, and does not consider the record of the trial itself." *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749 (1987). In considering that evidence, great deference is extended to the fact-finding of the suppression hearing judge with respect to weighing credibility and determining first-level facts. When conflicting evidence is presented, this Court accepts the facts found by the hearing judge, unless clearly erroneous. *See Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *Perkins v. State,* 83 Md.App. 341, 346–47, 574 A.2d 356 (1990). "When the question is whether a constitutional right . . . has been violated, we make our own independent constitutional appraisal. We make the appraisal by reviewing the law and applying it to the peculiar facts of the particular case." *Riddick,* 319 Md. at 183, 571 A.2d 1239; *see also Gamble v. State,* 318 Md. 120, 128, 567 A.2d 95 (1989); *State v. Wilson,* 279 Md. 189, 202, 367 A.2d 1223 (1977); *West v. State,* 124 Md.App. 147, 155, 720 A.2d 1253 (1998); *Walker v. State,* 12 Md.App. 684, 695, 280 A.2d 260 (1971).

Appellant argues that his statement to the officer as to why he possessed the knife was the only evidence at trial relevant to his intent to possess the knife. He claims that his *Miranda* rights were violated because, at the time he gave the statement, he was interrogated and deprived of his freedom to leave, without having been advised of his *Miranda* rights.[1]

In *Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court stated:

> To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopar-

---

1. The officer conceded that he did not advise appellant of his Miranda rights before appellant made the statement in question. At the suppression hearing, Officer Lagos's testimony provided:

    Q: Thank you. Before you asked him the question what is this, did you Mirandize?
    A: No, I did not.

dized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. . . .

*Id.*

"The progeny of Miranda has recognized that these warnings have no constitutional basis, but that they are prophylactic rules created by judicial decision to safeguard the privilege against self-incrimination." *McAvoy v. State,* 70 Md.App. 661, 666, 523 A.2d 618 (1987) (citations omitted). "Thus, preliminary to any decision to exclude evidence because it was gathered from the criminal suspect who was not advised of his *Miranda* rights is a determination of whether that evidence constitutes a statement stemming from custodial interrogation." *Id.* at 666–67, 523 A.2d 618.

██  According to *Miranda,* custodial interrogation has occurred if and when one is in police custody *and* is subjected to express questioning or its functional equivalent. *Miranda,* 384 U.S. 436, 86 S.Ct. 1602. A conviction must be reversed when a statement is admitted at trial in violation of *Miranda. See Mulligan v. State,* 10 Md.App. 429, 432, 271 A.2d 385 (1970) ("[A]ny statement obtained in violation of the procedural standards enunciated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 is per se to be excluded and the State is not afforded an opportunity to show that its admission was harmless error.").

*Miranda's* concern was with an interrogation environment so oppressive as to give rise to a presumption of compulsion in the context of the Fifth Amendment privilege

against "compelled" self-incrimination. The concern was with the Kafkaesque trappings of the "third degree." The drum-like refrain of the *Miranda* analysis repeated and re-echoed the theme of "incommunicado interrogation" in a "police-dominated atmosphere."

*Jones v. State,* 132 Md.App. 657, 667, 753 A.2d 587 (2000).

*A scanning of Miranda makes its thrust preeminently clear....* "The defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world." *Miranda* pointed out that all of the four cases being dealt with in that umbrella opinion "share salient features—*incommunicado interrogation of individuals in a police-dominated atmosphere* ..." It pointed out that the major danger of the "in-custody interrogation" is that *its incommunicado character* obscures a later judicial determination of what really transpired. "An understanding of the nature and setting of this in-custody interrogation is essential to our decisions today ..."

*Id.* at 668, 753 A.2d 587 (citations omitted).

The constitutional distillate of *Miranda* is that self-incrimination flowing from a custodial interrogation is, *ipso facto, compelled* self-incrimination because of *the inherent coercion—the inherent compulsion—of the custodial interrogation environment.* In the custodial interrogation situation, therefore, the constitutionally damning element of compulsion can only be extirpated by the elaborate prophylactic process of warning and waiver prescribed by *Miranda* as the required compulsion antidote. *Absent the compulsion, there is no need for the antidote.*

*Id.* at 669, 753 A.2d 587.

We shall determine whether appellant made his statement at a time when his *Miranda* safeguards were indeed applicable.

## Custody

[5] Appellant argues that he was in custody at the time he made this statement, and cites several cases in support of this contention. We agree. Officer Lagos testified as follows:

Q. Did the defendant have his hands on his head?

A. Yes, Sir.

Q. Were his feet spread?

A. Yes.

. . .

Q. Officer, the defendant was not free to leave when you found the knife in his possession, right?

A. Right

When officer Lagos patted down appellant and pulled out a fourteen-inch knife from appellant's waistband, he called out the other officer's name in order to make him aware of the discovery:

Q. Okay. And Officer Curt was to your left I believe you testified?

A. Yes

Q. Approximately how many feet?

A. Within 10 feet.

Appellant states that "[t]he police conduct in this case clearly would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business," and cites *Orozco v. Texas*, 394 U.S. 324, 327, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), in support of this contention. In *Orozco*, the suspect was in custody even though he was in his own bedroom, because he was under arrest and not free to leave. The Supreme Court, re-visiting *Miranda*, stated: "The *Miranda* opinion declared that the warnings were required when the person being interrogated was 'in custody at the station *or otherwise deprived of his freedom of action in any significant way.*'" *Id.* (quoting *Miranda*, 384 U.S. at 477, 86 S.Ct. 1602) (emphasis added).

A determination of whether custodial questioning has occurred requires, in the first instance, a finding that the defendant was in "custody," as that term is defined in the *Miranda* opinion. This is by far the most litigated aspect of *Miranda*, and an issue on which the Supreme Court has provided little guidance. *Compare Oregon v. Mathiason, supra,* 429 U.S. [492] at 494–95[, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)] (parolee questioned at police station not in custody because he was free to leave) *and Beckwith v. United States,* supra, 425 U.S. [341] at 347[, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976)] (suspect in tax fraud investigation questioned at a private home where he occasionally stayed was not in custody) *with Orozco v. Texas,* 394 U.S. 324, 327, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (suspect questioned in his bedroom was under arrest, not free to leave, and thus in custody) *and Mathis v. United States, supra,* 391 U.S. [1] at 4–5[, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968)] (suspect questioned about tax fraud while imprisoned on another charge was in custody).

*Whitfield v. State,* 287 Md. 124, 137–38, 411 A.2d 415 (1980).[2]

Deciding when a person has been significantly deprived of his freedom of action so as to be in custody within the meaning of *Miranda* depends on the factual setting surrounding the interrogation in each case. This issue has frequently been confronted by the courts of this country,

---

**2.** *Whitfield* has been overruled on other grounds; In *McAvoy,* we stated:
In *Whitfield,* the Court of Appeals held that a prisoner's statement concerning the location of a gun at the jail where he was confined was not admissible because he had not been given his Miranda warnings, reasoning that the emergency situation created by the presence of a gun in a prison provided no exception to the mandates of *Miranda.* It appears, however, that the Supreme Court subsequently recognized an emergency exception to *Miranda* in *N.Y. v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), ostensibly overruling *Whitfield's* holding.
*McAvoy,* 70 Md.App. at 667, 523 A.2d 618.
Nonetheless, we find that *Whitfield* was overruled only on the emergency situation exception to *Miranda,* and that its other findings remain valid law. Therefore, we quote with approval significant language from that case.

and a variety of tests have been developed as an aid for making that decision.

*Id.* at 139, 411 A.2d 415 (citations omitted).

The majority of courts that have explicitly addressed this question, however, have adopted an objective reasonable person approach to determining custody. *Id.* (citations omitted).

" * * * [C]ustody occurs if a suspect is led to believe, as a reasonable person, that he is being deprived or restricted of his freedom of action or movement under pressures of official authority. * * * [T]he custody requirement of *Miranda* does not depend on the subjective intent of the law enforcement officer-interrogator but upon whether the suspect is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. * * * "

*Myers v. State,* 3 Md.App. 534, 537, 240 A.2d 288 (1968) (quoting *People v. Hazel,* 252 Cal.App.2d 412, 60 Cal.Rptr. 437 (1967)).

### Interrogation

Once it is established that the appellant is in custody, the next consideration is whether he was interrogated. Appellant contends that he was subjected to police interrogation at the time he explained why he was carrying the knife.

In *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court stated: "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) *that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id.* (footnote omitted) (emphasis added).

Officer Lagos testified: *I said what are you doing with this is exactly what I said, . . . .*

■ Appellant asserts that Officer Lagos's question was designed to elicit an incriminating response, and, consequently, is a form of interrogation that cannot be characterized as routine questioning. We agree, and take this assertion one step further. We note that the officer's question represents an interrogation for *Miranda* purposes regardless of whether it was *designed* to elicit an incriminating response. It is important to note that the actual test, set forth in *Innis,* is not merely whether the question was *designed* to elicit an incriminating response, but, rather, whether the police officer *should know* that the question is reasonably likely to elicit an incriminating response from the suspect.

Officer Lagos's testimony as to his suspicion of gang activity at the scene indicates that he should have known that his question as to why appellant was carrying this knife would elicit an incriminating response. It is irrelevant for purposes of our analysis whether Officer Lagos was honestly hoping that appellant would provide an innocent explanation for carrying the knife. The dispositive factor in this analysis is whether Officer Lagos *should have known* that his question would elicit an incriminating response. Officer Lagos testified to having six years experience as a police officer and that he initially approached the subjects because of his suspicion of gang activity. He should have known that his question was reasonably likely to elicit an incriminating response.

The trial judge erred in his position on this issue.[3] We recognize the possibility, as the trial judge reasoned, that the

---

3. The trial judge stated:

Until then, really, what the officer is doing is he is making a reasonable investigation because it is possible in accordance with the Anderson case that the defendant could have said I use that for cutting up a deer or some other reason.

The officer doesn't know for certain what the reason is for carrying that knife and there could be an innocent purpose ... If he had given some innocent explanation, maybe he wouldn't have asked him to sit down and maybe he wouldn't have arrested him.

I am going to allow the statement in because I think the statement was made before there is an arrest and before the officer is required to give *Miranda* warnings.

officer would have indeed concluded his questioning and let appellant go if appellant had provided an innocent explanation as to why he was carrying the knife. Nonetheless, that point is not pertinent in our analysis. The test in this analysis is not based on what the officer was thinking, or whether such explanation could have prevented appellant's arrest. In fact, we are even inclined to agree with the trial judge that the officer's question may have been designed to produce an innocent explanation as to why appellant was carrying this knife and that the officer did not necessarily attempt to elicit an incriminating response. We are even inclined to agree that, had appellant given the officer an innocuous response, he may have been free to go at that time and not subject to arrest. Having said that, however, we emphasize that such reasoning is not appropriate as to whether interrogation took place under *Miranda.*

The main factor to be determined is simply whether the officer should have known that an incriminating response would be elicited. A review of the circumstances surrounding the officer's question demonstrates that it was indeed *very probable* that appellant's response would be incriminating. Based on Officer Lagos's testimony regarding the circumstances present at the time the knife was discovered, it is apparent that the officer was convinced that appellant did not have a legal purpose for carrying a concealed knife. Officer Lagos, once he discovered the knife, was seemingly convinced that a crime was being committed, so that a "general exploration into suspicious circumstances" was not needed at the time.

At the time this question was asked, appellant was involved in what Officer Lagos suspected was gang-like activity, and he was attempting to conceal a rather large knife under his shirt. Given these circumstances, we find it rather fatuous to assume that Officer Lagos was expecting appellant to answer that he was carrying the knife to or from a "hunting expedition," that he was using it to "cut deer," or as a tool to fix something. There is no mention of hunting gear, nearby hunting grounds, a toolbox, or any other item in the vicinity of Cinnamon Drive

and a Safeway store in Montgomery County that would have made it possible for Officer Lagos to infer any other use for the knife than as a weapon. In fact, the State, in its closing argument at trial, even conceded this fact: "Well certainly *from the circumstances* there is no indication that that knife was used for any other purpose than what the defendant said he was going to use it for to scare the other party." (Emphasis added.) The State also asserted: "The *circumstances indicate* that there was no other use for it. It is not as though he were coming from a legitimate place of employment or at least there is no evidence to indicate that."[4] (Emphasis added.)

Law enforcement would have been better served had Officer Lagos merely read appellant his *Miranda* rights prior to asking him this question. One of two things would have taken place. Either appellant would have remained silent at that point, or appellant would have nonetheless made the very same statement, albeit, this time it would have been perfectly admissible.

We reject the notion that *Miranda* does not apply to this case because this question was indicative of routine questioning, and therefore not proscribed by *Miranda*, pursuant to *Clarke v. State*, 3 Md.App. 447, 240 A.2d 291 (1968).[5] In *Clarke*, an officer, while filling out the forms in connection with the "booking procedure," asked appellant his name, ad-

---

**4.** The State had argued these points in support of its contention that it had made a prima facie case as to appellant's intent to use the knife as a dangerous or deadly weapon. While we agree with the State regarding the purpose of the knife's presence, we cannot allow the State to use the circumstances present during this incident as it wishes. If the State wishes to argue that the circumstances, regardless of what appellant had said, made it obvious that the knife was being used as a dangerous or deadly weapon, then it cannot also deny that this fact was just as obvious to the officer at the scene when he caused appellant to give his incriminating response.

**5.** The State did not argue this point in its brief. In fact, it was appellant that mentioned the *Clarke* case. Our brief analysis of this point was not in response to a contention raised by the State; we merely raise this issue for the sake of completeness.

dress, and place of employment. Appellant's response as to his place of employment led police to evidence proving appellant's guilt. Appellant argued that the evidence discovered was the product of his interrogation in violation of his *Miranda* rights. We rejected this contention, and we found that routine questions concerning a defendant's name, address, and place of employment are not proscribed by *Miranda*.

We compared the facts in that case to those of *Farley v. United States*, 381 F.2d 357 (1967), a Fifth Circuit Court of Appeals case. The defendant had been arrested for attempted burglary of a post office. After defendant had declined to tell the postal inspector anything concerning the crime, referring all questions to his attorney, the inspector made one more inquiry, asking defendant where he lived, and defendant answered. The purpose of eliciting this testimony from appellant was to negate any possible explanation for his presence at the scene of the crime by proving that he lived a considerable distance away. The Court held that this evidence was admissible, stating: "The place where Farley lived was, of course, not a matter within Farley's exclusive knowledge, and he no doubt recognized that a little investigation by the officers would locate that place. It was a circumstance having at most a remote bearing upon his guilt or innocence." *Id.* at 359.

That type of questioning is very easily distinguished from the question Officer Lagos asked appellant in the present case. The officer's inquiry as to why appellant was carrying the concealed knife had a direct bearing upon his guilt or innocence, and his intent for carrying the knife was essentially solely within his exclusive knowledge. We rule out the possibility that Officer Lagos's question was merely a routine question not proscribed by *Miranda*. In *Whitfield*, the Court of Appeals stated:

In contrast to custodial inquiry is "the traditional function of police officers in investigating crime ... [to conduct] [g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process," which does not require the use of the *Miranda* safeguards. *Miranda v. Arizona*, 384 U.S. at 477,

86 S.Ct. 1602. An on-the-scene investigation is normally envisioned as encompassing a general exploration into suspicious circumstances in order to determine if a crime has been committed; or as encompassing a probe into known crime which lacks an identifiable suspect.

*Whitfield,* 287 Md. at 131–32, 411 A.2d 415 (citation omitted).

In the present case, Officer Lagos's question represented more than mere on-the-scene investigation, as his question was not indicative of any fact-finding process.

■ We briefly consider whether there is any implication of an emergency situation that would provide an exception to the *Miranda* warnings, pursuant to *N.Y. v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).[6] We find that no emergency situation existed at the time Officer Lagos asked appellant why he was carrying the knife. Officer Lagos's trial testimony provided [7]:

A: When I initially rode up, there were two groups of subjects congregating on the sidewalk. Upon giving eye contact with me, both groups dispersed. One went to the right . . .

. . .

Q: Now at any time was the defendant, was he acting hostile towards you?

A: Hostile, no. He was very cooperative.

---

**6.** The State failed to make this contention; we briefly consider it, however, for the sake of completeness.

**7.** We quote trial testimony although we are cognizant of the fact that, when reviewing a denial of a motion to suppress, we must only look to the facts adduced at the suppression hearing. *In Re: Patrick Y,* 124 Md.App. at 608–09, 723 A.2d 523. We point out that the suppression hearing and trial testimony adduced similar facts relating to this issue, although the trial testimony presented this same evidence more fully and clearly. We find it necessary to quote from the trial testimony on this issue in order to more accurately and clearly set forth the facts of the case.

Q: At any time when you were first approaching these two groups, did you observe the defendant brandishing any weapon?

A: No.

Q: Did you overhear any yelling?

A: No.

Q: Did you observe the defendant fighting with anybody?

A: No, I did not.

Q: Did you observe anybody fighting?

A: No.

### *Traffic stops and Terry stops*

The State contends that the officer's question, and his detainment of appellant, did not rise to the level where *Miranda* warnings were necessary. We disagree. The State relies on *Jones* in this contention. This reliance is misplaced, as there was no "custodial interrogation" in that case. Jones had merely been subjected to a *Terry* stop on the street to await a show-up identification by a witness to a recent shooting. While waiting for the witness to arrive, the officer asked Jones several questions:

I asked him if he lived in the area, the specific area where we had encountered him, he indicated he did not. We asked him what he was doing or what he had been doing. He stated that he had been playing basketball with some friends and that he'd been dropped off on the corner.

I think, when I asked him where he lived, he gave me an address that was on the west side of town. I know that cause I used to work in the west side of town.

*Jones,* 132 Md.App. at 665, 753 A.2d 587.

Judge Moylan, writing for this court, stated:

The appellant, to be sure, had been seized within the contemplation of the Fourth Amendment and was not free to leave the scene. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). That was enough to engage the gears of the Fourth Amendment, but it was not enough to

engage the gears of *Miranda v. Arizona*. As *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), made clear, every lawful detention within the contemplation of the Fourth Amendment is not *ipso facto* necessarily "custody" within the contemplation of *Miranda*. *Id.* at 666, 753 A.2d 587.

At trial, Jones had wished to testify that he was present in the neighborhood to purchase food at a carry-out; however, his previous answers to the officer's questions effectively rebutted such an attempted explanation at trial. We considered his contention that his statements should have been suppressed due to a *Miranda* violation, even though we stated that the officer's "testimony as to what he asked the appellant and as to the appellant's responses seems totally innocuous." *Id.* at 665, 753 A.2d 587. Our holding in that case was that "the appellant was not in custody within the contemplation of *Miranda* and that there was, therefore, no need for him to have been given *Miranda* warnings." *Id.* at 666, 753 A.2d 587.

We point out that Jones had not yet been placed in custody, as the detainment had not progressed further than a *Terry* stop until after the witness arrived and made the positive identification. Further, it cannot be said that the officer in Jones should have known that his questions were likely to elicit an incriminating response. The only reason that Jones had attempted to suppress the statements was because he later decided to change his story to the effect that he had been in the neighborhood to purchase food. We could not expand our definition of "incriminating statement" to include a subject's answers to such basic and seemingly innocuous questions as where he lives and why he is in a particular neighborhood. At that point, no weapons had been found on Jones, and no probable cause existed that he had committed the shooting in question.

That is to be contrasted with our present case, where appellant had already been found to be in possession of a large knife concealed under his shirt. There is a major distinction

between an instance where one is merely asked why he is in a certain neighborhood, to which any of a limitless number of answers could provide a reasonable explanation, and a situation wherein a subject already suspected of being involved in gang activity is discovered to be concealing a large knife under his shirt.

The State's reliance on *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), is likewise misplaced. In *Berkemer*, the defendant had been lawfully stopped on the highway for a traffic violation and, while sitting in his vehicle, was interrogated by the stopping officer. He gave several incriminating admissions without having been given *Miranda* warnings. The defendant in *Berkemer*, relying on *Miranda*, argued that he had "been taken into custody or otherwise deprived of his freedom of action in [a] significant way" so as to require *Miranda* warnings. *Berkemer*, 468 U.S. at 435, 104 S.Ct. 3138. The Supreme Court, however, declined this line of reasoning, stating:

> [W]e decline to accord talismanic power to the phrase in the *Miranda* opinion emphasized by respondent. Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated. Thus, we must decide whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.

*Id.* at 437, 104 S.Ct. 3138.

Indeed, that was the very analysis later employed by the Supreme Court in *Berkemer* to distinguish a curbside detention, notwithstanding that it was a Fourth Amendment seizure of the person and that the suspect was not free to leave, from "custodial interrogation" under circumstances presumptively constituting unconstitutional compulsion. The mere "stop," unless it escalates into a more significant detention, will presumably be brief, whereas custodial interrogation may frequently be prolonged indefinitely, with the

suspect fearing that "questioning will continue until he provides his interrogators the answers they seek."

*Jones,* 132 Md.App. at 669, 753 A.2d 587.

Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced "to speak where he would not otherwise do so freely," *Miranda v. Arizona,* 384 U.S., at 467[, 86 S.Ct. 1602]. First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek. *See id.,* at 451[, 86 S.Ct. 1602].

*Berkemer,* 468 U.S. at 437–38, 104 S.Ct. 3138 (footnotes omitted).

Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact

that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda* itself, see 384 U.S., at 445, 491–498[, 86 S.Ct. 1602], and in the subsequent cases in which we have applied *Miranda.*

*Id.* at 438–39, 104 S.Ct. 3138 (footnote omitted).

At first glance, the language we have just cited from *Berkemer* and *Jones* is seductive—that is, until we arrive at the dispositive point of discussion. A careful reading of the following language from *Berkemer* uncovers a critical distinction. In *Berkemer,* the Supreme Court had compared the typical traffic stop with a *"Terry* stop," and explained the distinction between those types of stops and a formal arrest. The Supreme Court explained that neither a *"Terry* stop" nor a typical traffic stop involves the type of "custodial interrogation" that brings forth the applicability of *Miranda.*

Under the Fourth Amendment, we have held, a policeman *who lacks probable cause* but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda.* The similarly noncoercive aspect of ordinary traffic stops prompts us to

hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda.* *Berkemer,* 468 U.S. at 439–40, 104 S.Ct. 3138 (citations and footnotes omitted) (emphasis added).

The critical language that must be recognized within this quote presents itself within the first line—"who lacks probable cause." Within that phrase lies a critical distinction as to whether *Miranda* applies in these types of cases. In *Jones* and *Berkemer,* only reasonable suspicion was present at the time the statements in question were given. In those cases, the higher level of probable cause had not yet been reached when the statements in question were made. This is to be contrasted with the present case, where probable cause did in fact already exist at the time appellant made his incriminating statement. In the instant case, Officer Lagos *initially* only had an articulable suspicion that criminal activity was afoot, according to his testimony at trial:

A: When I initially rode up, there were two groups of subjects congregating on the sidewalk. Upon giving eye contact with me, both groups dispersed. One went to the right. The defendant and three other subjects stood on the sidewalk looking at me. I continued to come in contact with them. I saw three of them had their hands in their pockets ... Basically, I assumed why they were there and what they were doing in the area.

Q: You approached them to determine that?

A: Yes.

Q: Okay. What did you find out?

A: They didn't live in the area and they really had no reason to be there based on the statements that—

Based on this testimony, it is clear that the police officer had an articulable suspicion that the subjects were involved in some sort of criminal activity at this time; however, it is also clear that no probable cause existed at that point. Therefore, up until this point, what had occurred could be termed a

*"Terry* stop" or a brief detention, arguably of a consensual nature, as there was essentially no more of a detainment of these individuals than in a typical *"Terry* stop" or traffic stop. *Until that point,* there was no reason for appellant to be given *Miranda* warnings, and any statement he may have made would have clearly been admissible, as *Miranda* did not yet apply.

For appellant, the mood drastically changed for the worse when the knife was discovered. At the time Officer Lagos discovered the knife, probable cause clearly existed that appellant has and is committing a crime, namely, at the very least, carrying a concealed dangerous or deadly weapon. It should be noted that the term is *probable cause,* not *absolute certainty.* Therefore, even if the officer may not have completely ruled out the possibility that appellant had a legal reason for carrying the knife, probable cause would still have existed at this point. Irrelevant to our discussion is whether the probable cause commenced at the time the officer noticed the bulge or only later, at the time he actually discovered that the bulge was indeed caused by a knife. This is because both the discovery of the bulge and the actual discovery of the knife occurred prior to the officer's question. Therefore, to make this analysis somewhat simpler, we will consider the probable cause to have been present from the time the knife was actually discovered.[8]

The State would be hard-pressed to contend that probable cause did not exist at this time. During the hearing on the motion to suppress, Mr. Patel, arguing for the State, stated that "when the officer searched the defendant and [found] the knife, they [had] enough for a terry stop at least at that point

---

8. We will continue with this point in the chronology because, quite simply, it is less controversial. Certainly, it is much more likely that probable cause existed at the time the officer actually discovered that the bulge was caused by a "buck knife." In any event, it is unnecessary to determine whether probable cause existed before the knife was discovered (when only the bulge had been observed) because appellant gave the officer valid consent to search his person, and this issue was not raised by appellant.

and *probably even enough for an arrest."* (Emphasis added.) Thus, the State conceded that probable cause probably already existed at that point, for an arrest is only legally warranted when articulable suspicion rises to the higher standard of probable cause.

### Further Analysis

The State cites *Gantt v. State,* 109 Md.App. 590, 675 A.2d 581 (1996), in support of its contention that *Miranda* safeguards were not implicated in the case *sub judice.* In *Gantt,* we stated that "factors relevant to whether a questioning constitutes custodial interrogation include location of the interrogation, whether a suspect is sequestered or held incommunicado, the number of police officers present, and the duration of the interrogation." *Id.* at 595, 675 A.2d 581. The State's reliance on *Gantt* is misplaced, as the facts of that case are inapposite to the facts of the present case. In *Gantt,* the arresting officer, Officer Burrell,

> testified that he had received a call regarding an unspecified disturbance at appellant's home. He responded to the call and was approached by several individuals, all attempting to talk to him at once. Appellant was sitting in a chair in his living room. Because he was the quietest individual in the room, Officer Burrell approached him and asked, "What's going on here?" Appellant answered, "She wouldn't listen to me so I was choking her." Officer Burrell testified that, at the time he approached appellant, he did not know why he had been called, and that he approached appellant only to ascertain what had occurred. Officer Burrell did not suspect that appellant had committed a crime. Appellant's freedom to move was in no way restricted.

*Id.* at 593–94, 675 A.2d 581.

In *Gantt,* appellant contended that his statement in response to the officer's question "What's going on here?" was the result of custodial interrogation and should have been suppressed because it was not preceded by a *Miranda* warning. We found no merit in this contention. *Id.* at 594, 675 A.2d 581.

Appellant was not in custody at the time he made the statement. Appellant was in his own home; Officer Burrell was the only police officer present; appellant was not sequestered or held incommunicado. Officer Burrell had asked only the non-accusatory question, "What's going on here?," before appellant made his statement. Officer Burrell testified that, when he spoke to appellant, he was merely trying to find out why he had been called.

When he first approached appellant, Officer Burrell had no reason to arrest appellant. Even if we believe that appellant had been pointed out as "the man who did it", this accusation would fall short of giving Officer Burrell reason to arrest appellant. Officer Burrell did not restrict appellant's freedom of movement in any way. There was no reason for appellant to believe that he had been deprived of his freedom in any significant way. Appellant was not in custody and, therefore, Officer Burrell was not required to give him *Miranda* warnings.

*Id.* at 596, 675 A.2d 581.

The circumstances in *Gantt* are easily distinguishable from those in the case *sub judice.* In the present case, appellant had already been discovered to be concealing a dangerous or deadly weapon when he was questioned. He was already a suspect at that time, as probable cause already existed once the knife was discovered.

The State cites cases that are clearly not on point with the facts of our case. The State's cases do not present a scenario where probable cause is already present. In the present case, a concealed knife had already been found on appellant's person at the time he is asserting he was subjected to custodial interrogation. The major distinction is that in the State's cases there only existed an articulable suspicion of criminal activity at the point when custodial interrogation is claimed. When there already exists probable cause to arrest a subject, as opposed to a mere articulable suspicion, it is much more likely that the subject would not feel free to leave at that

point, and, further, would not feel that the questioning or detainment will cease shortly.

We agree with appellant in his assertion that the "common thread through all of [the State's] cases is that a reasonable person would not have believed that his freedom was curtailed in a significant manner." In the present case, however, as soon as the knife was discovered in appellant's waistband, a reasonable person in appellant's position would have understood from the immediate reaction of the officer, who called out a warning to the other officer on the scene, that his freedom of action was significantly curtailed. A reasonable person in appellant's position would not have believed that his detention would be brief, especially after he had just denied possessing any weapons. As appellant states in his brief, "A reasonable person would understand the discovery of the knife on the Defendant terminated any consensual investigation by the police as to this Defendant, and triggered the adversarial criminal process which required the Defendant to be Mirandized before subjected to interrogation."

The State cites *McGrier v. State*, 125 Md.App. 759, 767, 726 A.2d 894, *cert. denied*, 355 Md. 613, 735 A.2d 1107 (1999). The State's reliance on that case is misplaced, even though we held that *Miranda* was not implicated in that case. The defendant was a seemingly unauthorized person in an apartment building, and was therefore asked by a police officer why he was in the building and whether he could provide identification. We stated that the "focus was identity; the brief period that the officer held [McGrier's] identification card while the victim of an earlier assault was summoned from her third floor apartment does not implicate *Miranda*." *Id.* at 768, 726 A.2d 894. The facts in that case are inapposite to the present case, as there was no weapon found on McGrier, and probable cause had not existed at that point merely because he was present in the building at that time, although an articulable suspicion may have existed.

The State, while comparing the present case to *Jones*, argues that, in the present case,

there was but a brief investigatory stop, conducted during daylight hours, on a public street. Officer Lagos asked but a single question, to determine if there was some innocent explanation for [appellant's] carrying the knife. In this case, as in *Jones*, there was no custodial interrogation and *Miranda* is inapplicable.

No weapon had been found on Jones, and no probable cause existed that Jones had committed a crime when his statements were made. He had simply been detained in order for a victim to arrive for identification purposes. That is not similar to the present case in which a subject had just been discovered to be concealing a dangerous knife.

In the case *sub judice*, the trial judge incorrectly determined that *Miranda* only became applicable when the officer had decided to arrest appellant. At the suppression hearing, the judge stated, "I am going to allow the statement in because I think the statement was made before there is an arrest and before the officer is required to give *Miranda* warnings." The trial judge also stated that the officer "didn't effect that arrest until after the statement was made. That arrest was when he asked him to sit down. That is after the statement."

The judge's position is contrary to the law on this point for two reasons. First, in determining when custody has occurred, the officer's subjective intent as to when he decides to arrest a subject is irrelevant in this analysis; the relevant point in time at which *Miranda* applies is when a reasonable person in the subject's situation would not feel free to leave. Second, the trial judge placed too great an emphasis on the moment of arrest, which is actually not determinative for purposes of *Miranda*. It is not the point of arrest that brings forth *Miranda*'s applicability; *Miranda* applies at an earlier time—when custody occurs (along with interrogation). Therefore, on the issue of custody, the trial judge erred in his analysis in two critical respects: by considering the subjective intent of the police officer and by placing too much emphasis

on the point of formal arrest rather than when custody had occurred.

Although Trooper Williams apparently decided as soon as respondent stepped out of his car that respondent would be taken into custody and charged with a traffic offense, Williams never communicated his intention to respondent. A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.

*Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138 (footnotes omitted).

In *Berkemer*, the Supreme Court held that the defendant "was not taken into custody for the purposes of Miranda until [the officer] arrested him. Consequently, the statements respondent made prior to that point were admissible against him." *Id.* at 442, 104 S.Ct. 3138.

It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (*per curiam* ). If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda. See Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (*per curiam* ).

*Berkemer*, 468 U.S. at 440, 104 S.Ct. 3138.

■■■ We note the critical language contained within this passage from *Berkemer.* It states that *Miranda* becomes applicable as soon as one's freedom of action, or, in other words, one's freedom to leave, is curtailed to a "*degree associated* with formal arrest." *Id.* (emphasis added). This language demonstrates that, in order to find that there is custody, it is not dispositive whether a subject has actually been formally arrested, but, rather, whether a subject's freedom to leave has been curtailed to a *degree associated* with a formal

arrest. This indicates that we will consider custody to have occurred if a subject's freedom has been curtailed significantly, *even though a formal arrest has not yet taken place.* To interpret the custody requirement under *Miranda* any differently would ostensibly focus too much attention on the officer's subjective intent. To interpret this requirement as the State wishes unquestionably would provide police with an opportunity to circumvent all that was mandated by *Miranda.*

If we focus only on the point of actual formal arrest, then would not all police officers simply ask all of the questions they wished to ask of a subject and only officially arrest that subject after they have received all the information they wanted? Interpreting *Miranda* in the way the State contends would yield such results. Officers could ask any questions they desired, the answers would not be subject to *Miranda*'s safeguards, and officers only then would formally arrest their subjects, and subsequently give the *Miranda* warnings, after obtaining all the incriminating statements they needed. Detaining a subject while questioning him would not set forth *Miranda*'s applicability, even though the officer could practically keep his subject in detainment for as long as he wished, as the State could contend that such mere detainment does not rise to the level of custody or arrest. We cannot provide police authority with such a means to circumvent *Miranda;* therefore, we must recognize that custody is present not only when a formal arrest is made, but also at the time that one's freedom is curtailed to a *degree associated* with formal arrest.

In the case at hand, appellant was found to be concealing a dangerous or deadly weapon in circumstances tending to indicate his intent to use the weapon in such a manner. There existed probable cause that he was violating the law, and Officer Lagos had effected a curtailment of his freedom of movement when the weapon was found. We review Officer Lagos's testimony at the suppression hearing pertaining to this issue, beginning with his cross-examination by appellant's counsel:

Q: Officer Lagos, when you say he was under arrest a minute or so after the statement, what was the basis for making the arrest?

A: Simply because he was in possession of a concealed and dangerous weapon.

Q: Okay. So when you say under arrest, you mean you handcuffed him?

A: Correct. He was not free to leave at that time when I knew that he had that in his possession.

Q: Thank you. That was my question. In other words, when you saw the knife, he wasn't free to go?

A: No, he wasn't.

The State subsequently asked Officer Lagos several questions on this issue on redirect examination:

Q: Officer, the defendant was not free to leave when you find the knife in his possession, right?

A: Right.

Q: But you hadn't arrested him until approximately a minute later, correct?

A: Right.

Q: And when you ask him a question about what is this, that was still part of your investigation, correct?

A: Yes, it was.

To further clarify this issue, the trial judge then asked the officer:

Q: Officer, he wasn't free to leave when you found the knife?

A: Correct.

Officer Lagos's testimony indicates that appellant's freedom of movement was curtailed to a degree associated with a formal arrest as soon as the knife was discovered. Although, as we have stated, the subjective intent of the police officer is not dispositive on this issue, we must consider it as part of the totality of the circumstances to determine what a reasonable person in appellant's position would believe. Certainly there

was behavior or tone used by Officer Lagos at the time to indicate to appellant that once the knife was discovered he was in fact not free to leave. Officer Lagos shouted out to the other police officer on the scene when he discovered the knife. A person in appellant's situation would clearly realize that there was already suspicion centered on his activity, as is indicated by the officer's approach to the subjects in the first place. One who is subjected to such suspicion by a police officer would certainly not feel free to leave when, in addition to being suspected of gang activity, a large concealed knife had been found on his person. Subsequently, we find that appellant was indeed in custody under *Miranda* at the time the officer asked him why he had the knife.

Officer Lagos had an articulable suspicion that gang activity was taking place between the individuals he spotted on the sidewalk. Miranda was not yet applicable at this point. Subsequently, the officer's suspicions were strengthened when he recovered the knife from within appellant's waistband. We find that a reasonable person in appellant's position, after the discovery by a police officer of a large buck knife in his waistband, would certainly not feel free to leave. Initially, the investigation was brief and took place on the sidewalk of a public street and in front of a group of people. This did not bring forth sufficient circumstances for a "custodial interrogation" to have occurred within the contemplation of *Miranda;* therefore, appellant was not entitled to *Miranda* warnings prior to the discovery of the knife. Once the knife was found, it is extremely unlikely that any reasonable person would believe that the questioning would only continue for a brief period of time, and that the detention would soon cease. On the contrary, a reasonable person in this situation would certainly believe that things would only get worse, and that the discovery of a large concealed buck knife, in the circumstances that were present here, would inevitably lead to an arrest.

We find that appellant was in custody, as a reasonable person would certainly not feel free to leave in this situation.

We also find that Officer Lagos's question represented an interrogation under *Miranda.* Given the circumstances as they were at the time, Officer Lagos certainly should have known that it was likely that his question would elicit an incriminating response from appellant. Because appellant had been subjected to custodial interrogation without having been informed of his *Miranda* safeguards, we find that his *Miranda* rights were violated.

### Conclusion

We hold that the trial court erred in denying appellant's motion to suppress his statement to the police officer, and therefore we reverse his conviction for carrying a concealed dangerous or deadly weapon.

**JUDGMENT REVERSED.**

**COSTS TO BE PAID BY MONTGOMERY COUNTY.**